UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CHRISSIE ANN RICHARDSON                                                        PLAINTIFF

v.                                                               CIVIL ACTION NO. 3:03CV216-S

DANKA OFFICE IMAGING COMPANY                                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the court on motion of the defendant, Danka Office Imaging Company, for summary judgment.[1] (DN 105). The plaintiff, Chrissie Ann Richardson, worked as a commissioned sales representative for Danka for a number of years until her resignation in October, 2002. She alleges that Danka failed to award her 75% of copier transaction credits for sales of copiers to UPS for its Hub 2000 Project. This was known as a "25/75% split" where 75% of the sales credit went to the Installing Territory Representative and 25% credit went to the Writing Territory representative, for purposes of calculating sales commissions. Richardson was paid according to the incentive plan for regular sales credited at 50% and later 40% of the transactions. She contends however that she was entitled to a 75% credit on the ground that the sales were made pursuant to (1) a "hunting license" or (2) a "Centralized Agreement" for a "National Account" which had an assigned account executive located in the home office who was responsible for inputting all orders.

---

[1]This is a second motion for summary judgment filed by Danka. This motion was filed under the revised and extended scheme for discovery and dispositive motion practice. Richardson urges that the court should decline to consider the motion in light of the fact that this constitutes a "second bite of the apple." However, Richardson moved for and was granted leave to amend her complaint on the ground that discovery was in the preliminary stages and the issues had yet to be developed. The magistrate judge permitted the filing of additional dispositive motions after the close of discovery. The court will therefore consider the merits of this second motion.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976).  Not every factual dispute between the parties will prevent summary judgment.  The disputed facts must be material.  They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986).  The dispute must also be genuine.  The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party.  *Id.* at 2510.  The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.  *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968).  The evidence must be construed in a light most favorable to the party opposing the motion.  *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Richardson seeks to fit the UPS copier sales under definitions contained in various versions of the Sales Compensation Policies and Operating Procedures (the "commission plan").  However, the court finds that the undisputed nature of the sales – that these sales were made by someone *other than* Richardson – is dispositive of her claims herein.

In his deposition,  Steve McCoy, Richardson's former regional manager, testified that local UPS personnel did not have the authority to purchase equipment from Richardson.  He acknowledged documentation to that effect:

> Q: Okay.  Let me direct your attention to the first blocked paragraph, the one that begins it is imperative that these guidelines be performed exactly as outlined.
>
> A: Yes.
>
> Q: Looking down to the third bullet point, where it says all proposals and pricing are submitted through corporate/Mike or Sharon, and any representative presenting

proposal locally will jeopardize the contract, resulting in forfeit of business.  Now, did Ms. Richardson ever actually present proposals locally?

A: I don't think so.  I think she presented the solutions.  As far as proposing – I'm taking proposal to mean numbers and the financial obligation – that was all negotiated in Atlanta.  She more proposed the solutions of what they needed.

Q: So she would make a suggestion to the UPS local people, perhaps this copier would serve your needs?

A: Right.

Q: But in terms of proposing here is what the copier would cost you, here is when we can deliver it, or anything like that, that would be through the Atlanta office?

A: I believe so.

McCoy depo., pp. 28-29.  Richardson does not contend that she could or did make sales to local UPS

personnel, as there is no dispute that they did not have the authority to make such purchases.

James Hawkins, Senior Vice President of Field Support Operations for Danka, who was a

member of the Compensation Committee at relevant times, testified that

A:      The Centralized Agreement term was utilized within Danka, it was specific to 25 percent/75 percent splits where we had a – an agreement with the company on a central basis for their company's distributed offices to make decisions against a nationally established price.

Q:      And did UPS operate under that format?

A:      No, they did not.

Q:      How were they different?

A:      UPS made their decisions centrally in Atlanta and all decisions had to go through Atlanta...a centralized agreement as it was used within Danka had a preestablished price...And all field offices for those organizations that had those made their own decisions and could transact the sales and decide on those locally...UPS made it clear to us that that could not be decided locally and all decisions had to be made in Atlanta.

Hawkins depo., pp. 29-30.

There is no dispute that a "hunting license" in Danka parlance meant that there was a national agreement in place with predetermined pricing under which local offices of the company could make purchasing decisions based upon their specific needs. *See,* Hawkins depo., pp. 32-33. In accordance with the undisputed evidence, it is clear that the UPS agreement did not provide Richardson a "hunting license.". Richardson does not contend that UPS permitted local locations to make their own purchasing decisions. Rather, she notes only that a former employee, Jeff Standridge, testified that he had seen UPS listed as a "hunting license" on an unidentified list at an unidentified time. Standridge depo., p. 19. A group of "lists" has been produced as an exhibit to the summary judgment motion. *See*, Ex. A. UPS is not on any of these lists.

It is undisputed that the Compensation Committee generated the various lists. Communications from local management to the Compensation Committee sought to add UPS to or to rectify the perceived omission from the 75/25 split list. These communications and Richardson's own actions affirm the conclusion that the UPS account was not a "hunting license" account and that no Centralized Agreement existed with UPS.

The term "Centralized Agreement," or similar terminology, appeared in various versions of Danka's compensation plan. Richardson makes much of the fact that terminology changed from time to time, and that there were numerous split lists generated. But her anecdotal comments about confusion and change do not establish entitlement to a 75% split. In order to defeat summary judgment, Richardson must show something more than that the compensation plan was confusing and difficult to decipher. She must come forward with evidence establishing a genuine issue of material fact concerning Danka's obligation to afford a 25/75 split commission on the UPS account.

Richardson would have the court find a genuine issue of material fact concerning the meaning of "Centralized Agreements" because the term was defined in the April 1, July 1, and December 1, 1998 compensation plans as "[a]n agreement or contract where orders are processed and /or recorded in a central location for a customer's national equipment installations." She urges

that this general definition is broad enough to encompass the UPS account.  But we must look further at the rest of the definition.  It goes on to list "'hunting licenses,' association contracts, and purchasing consortiums" as "examples" of Centralized Agreements.  Richardson urges that these examples do not constitute an exclusive list.  But the doctrine of *juisdem generis*[2] requires that the general definition be limited by the class of examples set out therein.  The examples are transactions which involve local purchasing discretion.  All three "examples" refer to sales made at the local level pursuant to national pricing, as that concept was explained by Hawkins.  Thus there is no question whether the UPS account could come under the "Centralized Agreements" defined in the 1998 plans.

Richardson contends that the April 1, 1999 version of the plan redefined "Centralized Agreement."  Again she urges that the general definition encompassed the UPS account.  However, this version referred to a list of Danka's Centralized Agreements.  As noted earlier, UPS was not included on any list of Centralized Agreements, as Atlanta retained all decision-making authority.  Richardson has offered nothing to contradict this evidence.  Thus the UPS account has not been shown to be a "Centralized Agreement" under the 1999 version.

Richardson urges that the April 1, 2000 and October 1, 2001 plans also broaden the "Centralized Agreement" category of accounts by recognizing "Centralized Agreements and National Accounts" for 25/75 splits.  However, these versions of the plan state "See published account list for apportionment."  Again, the associated lists do not include UPS as a Centralized Account or National Account.[3]

---

[2]"Of the same kind or class."

[3]Richardson has produced a list entitled "NATIONAL ACCOUNTS" dated March 17, 2000 which lists UPS.  Richardson contends that UPS' presence on this list casts doubt on the evidence that the account qualified for a 25/75% split.  She has provided no information about this list, its source, or its purpose.  By contrast, the numerous versions of the "split list," entitled either "Centralized Agreements" or "National Accounts/National Agreements 25/75% Splits," did not contain the UPS account.  Richardson's nonspecific and unidentified list is insufficient to raise a genuine issue of material fact concerning whether the UPS

(continued...)

As of April 1, 2002, Danka no longer offered a 25/75 split on Centralized Accounts.  The UPS account was then designated an "Enterprise Account" under the 2002 plan.

Richardson next contends that she was wrongfully denied Canon vendor points and compensation for copier training and service contract sales.  These claims were added by amendment to the complaint after discovery.  Richardson has come forward with no evidence to substantiate a claim for entitlement to Canon vendor points or sales promotions.  Additionally, while Richardson has claimed that she was not paid for twenty-five training exercises which she performed, she did not seek payment for these exercises from Danka.  She does not deny that she failed to file KeyOp payment claim forms required for such disbursements.  She also does not dispute that she was aware of the process for obtaining payment, and that she in fact submitted one claim for which she was paid.

Danka states in its brief that "[t]he *only* reason Richardson did not receive additional KeyOp payments is that she did not submit forms to Bridgewater's office per Danka procedure."  Summary Judgment Mem., p. 21 (emphasis in original).  As a result, Danka has not established entitlement to summary judgment on the claim for wages due on training exercises.  While Danka urges that it did not deliberately withhold payment from Richardson, the argument misses the mark.  Danka states that she would have been paid had claim forms been submitted.  Thus Richardson may be able to prove she is entitled to payment for training exercises.

The claim is, to date, unsubstantiated by Richardson inasmuch as the court has not been provided any documentation in support of this claim.  Further, Richardson has not yet shown entitlement to such payment under the Kentucky Wage and Hour laws.  Rather, Richardson simply asserts at this juncture that summary judgment must be denied to Danka on the issue.  Despite the fact that Richardson has not come forward with evidence documenting the unpaid work, Danka does

---

[3](...continued)
account was a Centralized Agreement or National Account subject to a 25/75% commission split.

not apparently dispute that Richardson did performed various training exercises for which she was not paid.  Summary judgment must therefor be denied as to this claim.

Richardson has claimed fraud and promissory estoppel in Counts IV and V, respectively, of the Amended Complaint.  To establish fraud, Richardson must show (1) a material misrepresentation made to her, (2) which was false, (3) which was known by Danka to be false, or was made with reckless disregard for its truth, (4) which was made to induce her action, (5) which she actually acted in reliance thereon, and (6) which caused her injury.  *United Parcel Service, Inc. v. Rickert*, 996 S.W.2d 464 (Ky. 1999).  Similarly, proof of promissory estoppel requires evidence of a promise made to Richardson to induce her action, which did, in fact, induce her to act to her detriment. *Lichtefeld-Massaro, Inc. v. R.J. Monteuffel Co.*, 806 S.W.2d 42 (Ky.App. 1991).  There is no evidence of any material misrepresentation, false statement or promise.  Although she contested the fact that the UPS account was not on the 25/75 split list and her superiors sought to have that changed on her behalf, she was aware of Danka's position and she did not claim such a split on UPS sales.  Further, she he does not deny that she was aware that the UPS account was to be designated a "Enterprise Account" in June of 2002.  Rather she urges that it was unfair to deny her a commission on sales which were made after June 2002since she spent many months laying the groundwork for these sales.  Summary judgment must be granted in Danka's favor as to Counts IV and V of the Amended Complaint.

For the reasons set forth herein and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that

(1) Count I of the Amended Complaint is **DISMISSED.**

(2) Count II of the Amended Complaint is **DISMISSED.**
(3) Count III of the Amended Complaint is **DISMISSED except to the extent that it claims failure to pay wages for training on equipment installed in the Hub 2000 project at UPS after April 1, 2002.**

(4) Count IV of the Amended Complaint is **DISMISSED.**

- 8 -

(5) Count V of the Amended Complaint is **DISMISSED.**

**IT IS SO ORDERED.**